Mr. Chief Justice ShaRKEy
delivered the opinion of the court.
This appellant filed her bill in the vice-chancery court, to enforce her mortgage lien on certain slaves in the hands of the defendant, Silas F. Trotter. From a very complicated case, we shall extract such facts as seem to be necessary to a correct understanding of our conclusion.
It seems that the defendant, Joseph Trotter, a resident of Tennessee, was indebted to the complainant, a resident of Virginia, in about the sum of $27,000, on a debt that had been contracted with complainant’s husband in his lifetime. Trotter was also largely indebted to other persons. He held a plantation, containing one thousand seven hundred and sixty acres of land, in the Parish of Caddo, Louisiana, on which he had near sixty slaves. On the 5th of May, 1841, he duly mortgaged this property to secure the following debts, then existing, to wit: the sum of $ L0,000 to the heirs of G. W. Mayers of Alabama; the sum of $22,000 to F. W. and T. Boyd of Virginia, and also $10,000 to Kuhman, Abernethy and Hanna, of New Orleans. On the 22d day of May, 1841, he mortgaged the same property to complainant to secure her debt. It seems that he had also made a prior mortgage in favor of Miles S. Watkins. The bill alleges that the debts in the first mortgage mentioned were nearly paid off by the latter part of the year 1845, and it seems to be establised that the balance then due Watkins was $3058, and to Boyd $4,000. Watkins had procured an order of seizure under his mortgage in June, 1845, but no sale seems to have *34 taken place under it. On the 29th day of November, 1845, Trotter confessed a judgment in favor of Mayers for the amount of her debt, $11,000 with interest, in which judgment it was ordered that the mortgage be recognized and enforced. On the first day of December, 1845, a writ of fieri facias issued on this judgment, which commanded the sheriff of Caddo Parish to make the money out of the property mentioned in a description annexed, being the mortgaged property, or of the personal estate of Trotter. On the 2d of December, being the day after the execution issued, the sheriff seized the property. On the 3d of December, the sheriff served a notice on Trotter, as required by the law of Louisiana, that in three days he should advertise the property for sale, and Trotter having waived the three days’ notice, the sheriff proceeded to advertise. His advertisement bears date the 2d of December. Silas F. Trotter, as the agent of his father, required that the property should be appraised, which was accordingly done, and the valuation amounted to $26,984. The law required that the sheriff should give thirty days’ notice, and the sale was made on the 3d of January, 1846, at which Silas F. Trotter became the purchaser at #18,000, which was a little over two thirds of the valuation, property so offered being bound to bring two thirds of its appraised value. Previous to the sale, Silas F. Trotter, as the agent of the defendant in execution, directed the sheriff in writing to sell all the property levied on in “block,” as it is called, tha-t is, in one parcel, and in that way it was sold. Trotter, the purchaser, paid no money, but reserved enough in his hands to discharge the incumbrances of Boyd, (#4000,) and Watkins, (#3058,) and being the agent also of Mrs. Mayers, he receipted on the execution in her favor for the balance of his bid, to wit, $10,942, and took a conveyance from the sheriff.... This is a general outline of the history of the case in Louisiana. Silas F. Trotter afterwards removed the negroes, or part of them, to this state, as to which this bill was filed, to subject them to complainant’s mortgage, on the ground, that the purchase by Trotter was fraudulent and void, and conferred no title, The circumstance, that Trotter derived title under an *35 execution sale in Louisiana, makes no difference if he was a fraudulent purchaser, for even the judgments of a sister state may be impeached for fraud, and all proceedings under a judgment must be subject to the same rule, when a claim to specific property is made through such a medium. Now we are to inquire whether the purchase was made in fraud, either actual or constructive.
First, in regard to'the evidences of fraud in fact, which, if it exist, may affect the rights of the parties to it in a manner different from the effect of a mere constructive fraud. Here we must examine the particular circumstances which have been relied on as evidence of such fraud. It is charged in the bill, that Joseph Trotter conceived the scheme of fraud early in 1845, and procured the cooperation of other creditors, and of his son Silas F. also. A proposition to compromise with complainant, by giving certain property, is relied on as entitled to much weight, inasmuch as by it complainant was induced to believe her claim would be settled in 1846, and misled or thrown off her guard as respected the necessity of pressing her claim. This proposition was made in a written communication to Pearsall, a joint debtor with Trotter, in order that it might be laid before Mrs. White’s agent, which was done. But it was not accepted, nor was any definite answer given.' White’s reply was, that he would see Pearsall again on the subject, or write to him. This was in October, 1845. On the 28th January, 1846, Thomas W. White, the agent of Mrs. White, the complainant, wrote to Joseph Trotter, from. Huntsville, informing him (Trotter) that he was then at leisure, and would be pleased if a time of meeting, either in New Orleans, or on Red River, could be appointed, “for the purpose of making a settlement, and carrying out something of the views proposed by you to me, through our friend Mr. Pearsall, last fall.” Then it seems a reply to the proposition for compromise was delayed several months, and when it was made, it was not an acceptance of the terms, but only for a settlement in which might be carried out “ something of the views proposed.” Trotter was not bound to wait an indefinite period for an answer to his proposition. *36 White, the agent, was at fault for his delay. The judgment was not confessed for more than a month after the proposition for a compromise; and moreover, most of the property offered to White by the proposition lay in Tennessee, and was not subject to the judgment. The circumstance of this proposition having been made, is entitled to but little weight in establishing fraud. It was not of itself calculated to mislead, and could not have done so if ordinary diligence had been used by White the agent.
In the next place, we come to consider of the confession of judgment by Trotter in favor of P. D. Mayers as tutrix or guardian. This circumstance is not entirely free from grounds of suspicion, it is true, but still of itself was not fraudulent as to complainant: it did not postpone her lien, nor did it give Mrs. Mayers a preference, as she already held a prior mortgage, and was therefore entitled to preference. The judgment was not necessary as to the mortgaged property, because the mortgagee was entitled to have the mortgage foreclosed, by the law of Louisiana, by order of seizure and sale. By the judgment, however, a preference was obtained as to certain property on the plantation, work-horses, farming utensils, &c., not covered by the mortgage. But there is no complaint that Mrs. Mayers’ debt was not a just one; the confession of judgment was, therefore, not of itself fraudulent, and the particular circumstances attending the confession of judgment are not shown. Then, in the next place, áre we authorized to conclude that there was fraud from the circumstances, attending the levy of the execution and the sale? The judgment was confessed on the 29th of November, 1845; execution issued on the 2d of December, and was levied on the same or the next day. This, to be sure, indicated haste on the part of some one, still it may have been all right. The defendant in execution was entitled to three days’ notice of the levy before the property was advertised; this notice he waived, but Crain says this was done at his instance, as he wished to press the sale, in order that he might not be detained a month longer from going to New Orleans. It manifested a willingness to accommodate not very common with *37 defendants in execution. It shows that Trotter was very willing to have his property sold, and it may be that he had a motive in it: The next step in the progress of the matter was made by Silas F. Trotter, as the agent of his father, under a full power of attorney dated long anterior. He addressed a request to the sheriff that he' should sell all the property seized “ in block,” which was complied with. This is relied upon as a circumstance clearly indicative of fraud, and therefore requires to be closely examined. It seems to be the privilege of the debtor to have all property levied on sold together. Code of Practice, Art. 676. And it appears from the testimony that it is not unusual to sell property in that way. We must judge of this matter from the proof, and not from what might be our own opinion of the probable advantages or disadvantages of a sale made in this way. There is considerable conflict in the testimony. Some of the witnesses say the property sold best in this way; others think differently. One or two of them think it could not have been sold at all in separate parcels. Crain is-very positive that it could not; but his opinion is founded on the law of Louisiana, which provides, that incumbered property shall not be sold if the highest and last bid is not sufficient to discharge the incumbrance. Code of Practice, Art. 684. This would seem to be true if all the property sold is incumbered by prior mortgages, unless perhaps where each article had been mortgaged at a specific price; but he omitted to notice the fact, that part of the property levied on was not subject to a prior mortgage. The work-horses and mules, the farming utensils, the corn, the fodder and the stock, valued at five thousand dollars by some of the witnesses, was not subject to mortgage. His rule of necessity could not apply to this property. That much at least might have been sold separately. But although this may look like a suspicious circumstance, we are not authorized by the testimony to say that the result would have been different, or that this is a circumstance which proves fraud. Crain says that Silas F. Trotter, as the agent of his father, wished to have the property sold separately, but by his advice Trotter was induced to give the direction to the sheriff to sell it *38 all together, and his credibility is not impeached. His attitude was somewhat peculiar, it is true; he frequently counselled with Trotter as to the mode of conducting the sale. Trotter was attorney in fact for Mrs. Mayers the creditor, and also attorney in fact for his father the debtor, and it seems to have been understood in the neighborhood fhat he would purchase the property. ' He had employed Crain to collect the Mayers debt; but we are not therefore authorized to reject the testimony of Crain. We must then regard it as true, that Silas F. Trotter did wish the property sold separately. Prior to the sale the property was appraised by disinterested persons. The law provides for such appraisement when it is desired, and it provides also, that it shall no.t be sold unless it will bring two thirds of its value, or if it do not, that it shall be sold on a credit. Code of Practice, Art. 680, 681. The appraisers were examined, and testify to the fairness of their valuation; they deny that any influence was exerted or attempted by Silas ■Trotter. At the sale a number of persons were present, and Silas Trotter bid $18,000, being a little over two thirds of its value. No efforts were made to keep off bidders, and some of the witnesses say that if Trotter had not bid, no one else would have done so. The sale cannot be questioned then on the score of inadequacy of price, since the requirements of the law have been met. But it is said the amount of incumbrances was not truly shown at the time of sale. The law makes it the duty of .the sheriff when he sells, to produce and read a certificate from the parish judge, stating the incumbrances on the property. It seems the credits on the prior mortgages were not shown. This might be a very material circumstance under our law; but we have already seen that property in Louisiana must bring the amount of prior incumbrances, when sold under a junior lien, and then the purchaser is authorized to hold in his hands the amount of the prior incumbrance. Code of Practice, Art. 683. It must have been known, therefore, that the prior incum-brances did not amount to the sum bid, otherwise the property could not have been sold. Bidders could not have been deterred on this account. Silas Trotter paid no money on his purchase. *39 He retained in his hands $3058, the balance of Watkin’s claim, and $4000, the balance due Boyd, and, as the agent of Mrs. Mayers, credited the execution with the balance of his bid, $10,942. By law he was authorized to retain the amount due on the prior mortgages, and Crain say's, as attorney for Mrs. Mayers, he consented to the credit, as Trotter was her authorized agent, and acted, in this particular, under a special agreement with Mrs. Mayers. And here it is necessary to state what that agreement was, and thus show Mrs. Mayers’ attitude in this transaction. On the 29th of May, 1845, Mrs. Mayers, in Franklin county, Alabama, executed the power of attorney to Silas F. Trotter, giving him full power to collect the money due her from Joseph Trotter, either by proceeding on the mortgage nr otherwise. This power of attorney was executed in her capacity of guardian of her children, in which capacity the money was due her. The agreement seems to have been to this effect, that if Silas F. Trotter should become the purchaser of the property at the sale under the mortgage, Mrs. Mayers would extend the time of payment., provided he would give his bonds with his mother and Joseph Trotter as surety. Under this agreement it was that Silas entered the credit on the execution, and accordingly executed the bonds or notes, with a mortgage on the personal property to secure their payment. In her answer, Mrs. Mayers alleges that she desired the mortgage on Joseph Trotter’s property to be foreclosed, because of his embarrassed condition and the anxiety she felt about the debt. Her agreement with Silas Trotter is the only circumstance on which she can be implicated in the scheme of fraud, if it existed. It seems, from a letter from her counsel in Alabama, that she had great confidence in the integrity of both Joseph and Silas Trotter; and she has participated in no way to bring about an unfair sále, or one which might result to the benefit of Silas Trotter, unless in the manner spoken of. Nor does it seem that she even knew any thing of complainant’s claim, unless that knowledge'be fixed on her constructively by the knowledge of her agent.
Another circumstance relied on, as evidence of fraud, is the *40 inability of Silas F. Trotter to pay so large an amount. It seems however, that he owned some fifteen or twenty negroes, and he also borrowed money to pay off the senior claims; and as he made an agreement for an extension of credit with Mrs. Mayers, the circumstance of hi's poverty is certainly not very conclusive.
We have thus noticed the material circumstances of the case; they are of themselves not inconsistent with entire fairness; and if the complainant had been fully cognizant of the proceeding, manifestly there would be no solid ground of complaint. But it is mainly on her ignorance of the proceeding that the charge of fraud is rested. Without fault in her, this could not have been so. She, it seems, had an agent in New Orleans, and that agent says that Joseph Trotter had promised to let him knew if proceedings should be instituted for the sale of the property. When •this promise was made, does not appear, nor does it appear how much reliance was placed upon it. It is a circumstance, to be sure, which tends to show a secret design, but not sufficient to sustain the charge.
For the law of this case, we are referred to articles 1973 and 1979 of the civil code. These articles seem to refer to mere contracts between individuals, and furnish nothing very satisfactory as applicable to the present case. The last article provides that contracts shall be deemed fraudulent as to creditors, when the obligee knows that the obligor is in insolvent circumstances, and when such contract gives to the obligee, if he be a creditor, an advantage over other creditors. The case of Bandac v. His Creditors, cited from 4 La. Rep. 247, was a decision based on article 1979. It was a contest between a mortgagee and other creditors who had been postponed. It decides that a debtor, in a failing or insolvent condition, cannot give a preference to a creditor who takes the security, knowing the obligor to be insolvent or unable to pay his debt, but it must be clearly shown that the preferred creditor knew the fact of insolvency. The case of Ingham v. Thomas, 6 La. Rep. 83, but reiterates the same principles. The cases moreover decided that article 1979 establishes a rule of presumption, which makes contracts so entered into, *41 •prima facie void. Another case is cited from the same book, (538,) which, in addition to the above principle, also decides that this presumption of fraud does not arise as against one who is not a creditor, but an original purchaser for a fair consideration. The decision in 10 La. Rep. is one of a similar character to those above mentioned. The case in 4 Rob. Rep. 408, decides that mere insolvency will not be sufficient to justify the setting aside the contract which prefers one creditor to another, unless it also be shown that such preferred creditor had a knowledge of the insolvency, and also that such contracts are not liable to be impeached or set aside after the lapse of one year. And it seems, from the case cited from 5 Rob. Rep. 288, that a preference obtained even by the formalities of the inscription of a judgment procured for the purpose, stands on no higher ground than a mere contract. These principles seem to be established by the cases, to wit: that a contract is deemed fraudulent which gives one creditor a preference over others, if the party to be benefited by the contract knew of the insolvency of the obligor, which knowledge must be shown by the party who attacks the contract ; that the contract must be attacked within one year; that the rule only applies as between creditors, and does not extend to cases in which there was no indebtedness; and lastly, that judgments extended solely for the giving of a preference, stands on the same ground with contracts. None of these decisions seem to reach the case before us. Silas F. Trotter was not a creditor, and therefore the legal presumption does not arise as against him; he can only be reached by proof of an actual.fraud. Mrs. Mayers was a creditor, and her judgment might fall under the rule established, but there is an absence of proof on the subject of her knowledge of Joseph Trotter’s insolvency; this point does not seem to have attracted the attention of counsel. But as to her there is another difficulty ; she obtained no preference by the judgment; that she already had by her mortgage. She may have obtained such preference as to the property not included in the mortgage, the work-horses, farming utensils, &c., but that is not a subject of controversy; that property is not within our jurisdiction; we are called on to exert jurisdiction over the mort *42 gaged property, as to which, if we disregard the judgment, Mrs. Mayers’ mortgage is a prior lien. We are then thrown back to draw our conclusion as to the actual fraud from the facts. The case is certainly not free from doubt. It presents an uncomely exterior, beneath which there is probably much hidden deformity, but it will not do to rest our judgment too far upon presumptions. Fraud, like all other facts, must be established by proof. Like other facts, it may be shown by direct or circumstantial or presumptive proof, but the proof ought to be satisfactory. We do not feel authorized, therefore, to say there was fraud in fact, and this brings us to the next inquiry:
• Second, was there a fraud in law? On this point it will be only necessary to notice a single feature of the case; the position which Silas F. Trotter occupied with regard to the debtor and creditor, and the property pledged. First, he was attorney in fact for the debtor, who lived in Tennessee. His authority or power of attorney was very comprehensive, and he levied on and mortgaged the plantation in Louisiana. In the next place, he was attorney in fact for the creditor, Mrs. Mayers, acting under an authority which invested him with full power to do any thing and every thing in securing or in collecting her debt, and he also wished to become purchaser, and actually did so. He was acting in a threefold capacity, —for the debtor, for the creditor, and for himself. For the debtor, he was bound to make the property, if it should be sold, bring as much as possible, and he was under the same obligation towards the creditor, but for himself he was interested in getting it as low as possible. The law decides which interest preponderates, and on that account imposes its check, and declares purchases made by a person so situated, fraudulent in law. It will not permit any one to make a profit, or have the opportunity of doing so, in consequence of the confidence reposed in him. One of the chief heads’ of constructive frauds includes those cases which arise from some peculiar confidential relation, existing between the parties, or out of some fiduciary capacity; and the principle upon which courts of equity act in such cases is one of public policy. It is the surest means of protecting the unwary, and of guarding against *43 the prepondering influence of self-interest in those who may happen to be in a situation which would give them advantages. Judge Story enumerates the several relations to which this doctrine applies, including parent and child, guardian and ward, client and attorney, principal and agent, trustee and cestui que trust, &c., and concludes by laying down the doctrine thus: “On the whole, the doctrine may be generally stated, that wherever confidence is reposed, and one party has it in his power, in a secret manner, for his own advantage, to sacrifice those interests which he is bound to protect, he will not be permitted to hold any such advantage.” 1 Story’s Equity, 349.
Jeremy, in speaking of this rule in its application to trustees, says, “But it being considered that no court of justice is equal to the full investigation of the truth, or capable of avoiding deception in all cases of this kind, this court will not affect to sift into the motives of the parties in every such instance, or to ascertain whether the transaction is morally right; but seeing that if a trustee were permitted to purchase in an honest case, he might do so in one having that appearance, but which, were it not for the infirmity of human testimony, or falsehood, would appear to be grossly otherwise, it has thought fit to lay down a general rule on the subject.” He says this rule applies to attorneys, executors and administrators, agents, commissioners in bankruptcy, and in all cases where confidence is reposed, and one party has it in his power, in a secret manner, for his own advantage, to sacrifice those interests which he is in conscience bound to support. Jeremy’s Equity, 395. It was applied by Chancellor Kent to the case of a trustee, in Green v. Winter, 1 John. Ch. Rep. 26, and to the case of an agent in Parkist v. Alexander, Ib. 394. It was not necessary in such cases to prove that the purchaser made a profit, or that loss resulted to the other parties; the law acts on a general principle of public policy. In the application of this rule, it is proper that we should not state it too broadly as to all cases. It would seem that it has sometimes been regarded as a rule of prohibition, and in other instances only as a rule of presumption, or 'prima facie evidence of fraud. Thus, in reference to a trustee, Jeremy says, “It in a manner *44 places him at the mercy of his cestui que trust, unless he can prove to the satisfaction of the court, after a zealous and scrupulous investigation of the circumstances, that there was no fraud, no concealment, and no advantage taken by him.” Now suppose he should prove all this, difficult as it may be, is the purchase then to be upheld as valid ? Such would seem to be the result of the author’s remark, and if so, this is only a rule of presumption, even in regard to trustees, and not one of prohibition, and this gives a flat contradiction to the notion that a trustee cannot purchase at his own sale. We apprehend, however, that, as to a trustee, it is a rule of exclusion. Judge Story takes a distinction between an attorney and a trustee, and holds that the attorney takes the onus of proving the entire fairness of the transaction, and then it will be upheld, but a cestui que trust may set aside the transaction at his option. He seems to regard agents as being in a condition similar to attorneys. But certainly the reason and policy of the rule would seem to dictate that it should be applied in its most rigorous form to agents, and especially to agents at a distance. They usually have more power than a trustee.
This doctrine, in its application to purchases by assignees, under a commission of bankruptcy, was very much considered by Lord Eldon, in several cases. In Ex parte James, 8 Vesey, 337, he says, “ This doctrine, as to purchases by trustees, assignees, and persons having a confidential character, stands much more upon general principles than upon any individual case. It rests upon this: that the purchase is not permitted in any case, however honest the circumstances; the general interests of justice requiring it to be destroyed in every instance, as no court is equal to the examination and ascertainment of the truth in much the greater number of cases.” • In a similar case, the same distinguished lord chancellor extended the doctrine still further A person, desiring to purchase part of a bankrupt’s estate, desired one who was his attorney and also his banker, t'b bid for him, as he could not be present; the attorney replied that he was solicitor for the commissioners, and could not therefore do so; thereupon he was requested to engage some other person to bid; at the sale, he spoke to one of the commissioners to bid, who did so *45 for the person who wished to buy the estate, and it was struck off to him. The bankrupt applied to have this sale set aside, and it was decided that neither a commissioner nor the solicitor could bid for themselves or for any body else, and the sale was set aside, although it was admitted to be fair. Ex parte Bennett, 10 Vesey, 381. Ex parte Lacey, 6 Ib. 625, was one of a similar character. From a review of these cases, and from the case of Owen v. Foulkes, cited in a note to Ex parte Lacy, it seems to have been the opinion of Lord Eldon that in all cases of confidential relation, the rule is one of prohibition ; that a trustee, or other confidential agent, cannot buy. But this is not very material, in the present instance. Even if the purchase by Silas F. Trotter is but prima facie fraudulent, and might be upheld by proof of its entire fairness after a “ zealous and scrupulous examination,” we do not think it has been brought within such rule. We have already said there was grounds for doubt, and room for suspicion.
The next question is, Can one who occupies the place of a mere creditor, set aside this purchase? On this point we cannot doubt. If the sale was void as to the debtor and the creditor, it was so as to complainant, a mortgagee of the property. She had a direct interest in the subject of the purchase. Nor does it make any difference that this sale was made under execution. Trimble v. Turner, 13 S. & M. 348. The sales of commissioners in bankruptcy, are public, and made in obedience to law, and to such cases we have seen the doctrine applies.
It is scarcely necessary to say any thing as to the proceeding by monition, as it does not cure defects in sales which are vicious by the acts of the parties.
It only remains to settle the principles of the decree. Ordinarily, in cases at law, the party must lose all advantages gained by fraud, as well as the money that may have been paid by him. Stovall v. Farmers and Merchants' Bank of Memphis, 8 S. & M. 305. But this rule does not apply in equity, where the party seeking to set aside a purchase, has been benefited by the discharge of incumbrances, or the payment of debts. Walker v. Brungard, 13 S. & M. 723; Grant v. Lloyd, 12 Ib. 191. *46 An actual and a constructive fraud may well stand upon different grounds in this respect. When a sale is set aside on the ground of constructive fraud, the purchaser must be put in the same situation he was before the purchase. Ex parte James, 8 Vesey, 351. This is precisely in accordance with the civil law, article 1978, civil code, which also holds that, even in cases of actual fraud, the party shall be restored for so much as he may prove inured to the benefit of the creditor. Article 1797.
On this principle it is an easy matter to adjust the rights of the parties. The purchase was invalid as to the property. The property was valued, and Trotter purchased at two thirds of the value. If he has discharged the prior mortgage to that extent, to wit, the amount paid by him on the particular property which may be in this state, he is entitled to be reimbursed. He must pay hire for the negroes, and will be allowed interest not to exceed the amount of the hire. The complainant will be entitled to the balance, produced by a sale of the property, and an account must be taken. /
Judgment reversed, and cause remanded.
Mr. Anderson filed a petition for a re-argument, on the ground that it nowhere appeared in proof in the case, what was the law of Louisiana, on the point upon which the case turned. That the sale took place in that state, and if fraudulent in law, and not in fact, as had been determined, it must have been so by laws of that state; a circumstance which could only be shown by proof; of which he insisted there was none in the record; but the question bad been adjudged upon a principle of equity, prevailing in this state, and in England; and having no application, so far as appeared, in Louisiana.
The petition was refused.